Case number 4-17-0936, Consuela Ortega Plaintiff v. Dr. Edward Kolb. Appearing for the appellant is Attorney Ronald Kalish, is that correct? And for the appellee is Attorney Peter Brandt. And counsel, I've identified counsel that will be arguing this afternoon, is that right? Alright. Mr. Kalish, are you ready to proceed? You may. May it please the court, counsel. This medical malpractice jury trial involved serious and permanent injury to my client's median nerve after a routine and elective carpal tunnel surgery performed by Dr. Kolb. And it resulted in a not guilty verdict in favor of Dr. Kolb, which was the result, product of, I believe, three serious errors. The first is a 213 violation by Dr. Kolb and by Dr. Fernandez. The second is irrelevant testimony by Dr. Fernandez regarding patients in general. And the third is the highly improper closing argument comments, insinuating that I fabricated evidence for the jury. And as to the first issue that I'd like to comment about, the 213 violation by Dr. Kolb. The issue in the case was causation. This is a tough medical malpractice case that often turned on these very important issues. The prior issue in the case was causation. Dr. Kolb, at his discovery deposition in 2012, said he had no opinion regarding the cause of this neuroma. Four years later, at a disclosure, a 213 disclosure, Dr. Kolb did not disclose any opinions. He was identified as an F3 witness. Did not disclose any opinions regarding the cause of the neuroma. Zero. In 2017, just a few weeks before trial, they file a supplemental disclosure. And for the first time, they offer opinions regarding causation by Dr. Kolb. The causation opinion had to do with the fact that the neuroma was there before he ever operated on the patient. And it had causation opinions regarding neuromas. This was well after all the depositions were done. I came in on a motion to strike those opinions, and the court granted it. The court had a hearing, and determined that under the Sullivan factors, these opinions were, number one, not timely by Dr. Kolb. Number two, even as a logical corollary, they weren't a logical corollary to those disclosed opinions. So they were stricken completely. So I show up to trial, and that's a key ruling. I show up to trial a few weeks later, expecting the case to be tried on the issues raised in the depositions and in the disclosures. And that is this, that the neuroma, according to my expert, was caused when Dr. Kolb's scalpel went past this ligament, when he's cutting open the ligament, went into the nerve. That was my expert's opinion. Their expert's opinion was that the neuroma was formed because of constant pressure by this ligament over that nerve. That was the case. Those were the two issues of causation. If the jury believed my expert, I was going to win, because that knife is not supposed to cut the nerve. If the jury believed Dr. Kolb's expert's opinion, that that neuroma formed from that chronic compression of that ligament on that nerve, if the jury believed that, I was going to lose the case, because that had nothing to do with anything that Dr. Kolb did. But that's not what happened. I get to trial, and I put on Dr. Kolb as an adverse witness. He makes no mention of causation. Nothing. I rest my case. Dr. Kolb's the first witness called by the defense. And out of nowhere, he stands up in front of the jury and announces that this is the most important part of this case. And he discloses for the first time that in his opinion, the neuroma was caused by nerve degeneration. Very important for this court to understand. Significant difference between his opinion about nerve degeneration as being the cause of the neuroma, and the theory that they went into this trial on, which is compression of the nerve. And I'll tell you why it's important. They had a problem with the case that they realized when they got weeks before trial. And that is, if they stick with their theory, that the compression, long-term compression from use of the wrist of that ligament, caused the neuroma. They stick with that theory. Then when Dr. Kolb did his surgery, he would have seen the neuroma. Because we know there was a neuroma that was found and operated on and removed by a subsequent surgeon, Dr. Fernandez. So they had a problem. How were they going to explain? Because Dr. Kolb never mentioned that he saw a neuroma when he opened up that ligament. So they had a problem. They also had a problem because, if Dr. Kolb opened that ligament and didn't touch the nerve with his scalpel, then how do they explain why she got so much worse after his surgery? If all he did was just slice open that ligament? So that's why they came up with this nerve degeneration opinion. And it devastated me. I had no idea. They pulled out an EMG, which I concede was a part of the record. It was from a year before her surgery. And all the witnesses talked about the EMG. And they said the EMG shows that she's got severe carpal tunnel syndrome in both wrists. That was the extent of the EMG talk. Dr. Kolb gets up on the stand, after my expert had done, and says, oh, the most important part of the case is the EMG because the EMG talks about motor nerve degeneration in the forearm. And if you look at the record, the court reporter notes that he's gesturing to the jury that the nerve degeneration, as shown on the EMG, is down here below where the incision was made in the forearm. The phrase is proximal to the carpal tunnel, is what the EMG said. So Dr. Kolb says, look, this is the cause of the neuroma. It was there from nerve degeneration that she had before I even operated on her. What does that do? Now, and he's pointing like this, what does that do? Now the jury is like, aha. Now I can see why Dr. Kolb would not have seen the neuroma because this nerve degeneration is down here. And again, the nerve degeneration caused a neuroma, never before uttered by anybody. I couldn't recover from that. All I could do is cross-examine Dr. Kolb and get him to concede at that point that that's a new opinion, that he had never before uttered those words in any of the depositions, in any of the disclosures. How does that prejudice me? This happened when I had rested my case, when my expert was long gone. There was nothing in the 213s. The 213s require strict compliance. I don't have to remind the court of the litany of cases regarding 213s. Strict compliance, not tactical gamesmanship, follow the plain language of 213. He was disclosed as an F3 witness. Conclusions, opinions, and bases are required by that rule. He never once wrote anywhere in his disclosure that he had the opinion that nerve degeneration was what caused that neuroma. The only two opinions were what I mentioned earlier. Wouldn't it be correct that the Rule 213 disclosures, he made reference to the long-term effects of the carpal tunnel syndrome, and that nerve pain was caused by severe nerve compression that was experienced prior to the time she ever saw me? That was his theory, and I can live with that. Why is that different? How is it different than the neuroma, if the neuroma is in a different location than where he incised? It's because if the nerve was being compressed by that ligament, he would have seen it. And so I was prepared to deal with that issue. His theory was that she had long-term compression of the nerve from carpal tunnel, and even when we cut open that ligament and release the pressure, a neuroma can form. He would have seen it if that's what happened. And that was his problem. That's why it's different. He only said that this patient had nerve damage from compression of the nerve. That's the key. Very important, like I said, the distinction between compression of the nerve causing the neuroma, which I could deal with, versus what he came up with, which was nerve degeneration prior to me ever touching this patient, down in the form. Completely moved the location of, and it was an explanation as to why he didn't see the neuroma, because he couldn't get around that. So the theory that they had, that that ligament from many years of use, presses, presses, presses on the nerve, that's what caused the neuroma, I could deal with it. I was going to win that issue. Because he couldn't explain why he didn't see it when he cut her open. You see? And so that's why it's prejudicial. Was it undisputed that the neuroma should have been seen when he operated? I thought that the record indicated that it was possible for that to form after the surgery. The neuroma? No. What the record reflected is that the neuroma could form from years of compression by that ligament over the nerve. That's where it could form. That I have no problem with. Because I could deal with that. Because Dr. Kolb couldn't explain why he wouldn't have seen it.  when he releases the ligament, and allegedly doesn't touch the nerve, he can't explain why she got worse. So the neuroma can form from compression. I have no problem with that. But it changes the location. That's the key. My question is, was it undisputed that this neuroma would have been there only prior to Dr. Kolb performing the surgery? Or was it also an issue that it could have formed after the surgery? I want to make sure I understand your question. There was no dispute that the neuroma, absent the 213 violations, the neuroma formed in their theory before the surgery. Which surgery? Before Dr. Kolb's surgery. We say it occurred after. We say it was the scalpel on that day that cut into that nerve that later turns into this ball of nerve. That's our theory. Their theory was, she had years of compression, I cut open that ligament, and that compression of that nerve is what caused the neuroma. So you're saying their theory was that the neuroma was already there. Correct. And then at trial, boom. They're saying, because they couldn't get around why he wouldn't have seen it. Because if their theory was their theory, he would have seen it. And why would she have gotten worse? The neuroma was already there. She may not have gotten better, but they couldn't explain why she got worse, and they couldn't explain why he didn't see it when he operated, because it wasn't in his operative report. He didn't say, I cut open the ligament, I looked at the nerve, there was a neuroma. Nothing. As to Dr. Kolb, you didn't file any objection to his Rule 213 disclosures, right? And I understand why, based on what you said, you only filed an objection to that supplemental. Correct. And that's because in his 213 disclosures, he doesn't mention that nerve degeneration was his opinion as to what caused her neuroma. And what's the difference between nerve degeneration and compression? Huge. Well, huge difference. Okay? Since I left that trial, nerve degeneration, first of all, it's a neurology expert. These are orthopedic surgeons. Nerve degeneration doesn't cause a neuroma. I didn't have an expert that could explain that. I was stuck with Dr. Kolb getting up there and saying, reading the EMG, putting it up in front of the jury, seeing the words nerve degeneration, it's dated before he ever operated on her, and he just makes the leap and says, that nerve degeneration is what caused her neuroma. So, I don't believe that nerve degeneration, I didn't have the opportunity to hire an expert to tell the jury that nerve degeneration doesn't cause a neuroma. And so, that's what I was stuck with. Him having that testimony, that the jury could now say, aha, this was there before, you wouldn't have seen it were you cut, and not guilty. That's the prejudice. And do you agree that in his 2013 disclosure, Dr. Kolb indicated that he thought that the neuroma was the result of her history of severe carpal tunnel syndrome and the EMG test, that he didn't believe that the surgery that he performed caused it, that it was there prior to him performing surgery? I believe that he would have been allowed to testify that the neuroma was from years of compression of that ligament. That was a disclosed opinion. And I believe that the EMG finding was only discussed to explain that she had severe carpal tunnel surgery in both wrists and she needed surgery. That was the extent of what was talked about in those EMGs. It was Dr. Kolb when he took the stand who made that leap to say that nerve degeneration is now the cause of that neuroma. That's the leap that he made. So, yes, I have no problem with their theory that compression of the nerve caused the neuroma. The reason I could deal with that without repeating myself is that he didn't see it in his operative report. So the jury was hearing testimony, would have heard testimony on my cross-examination would, was would have been had he not changed his opinion on causation would have been Dr. Kolb if your theory is that that ligament from years of repetitive use was causing a neuroma and you cut that ligament right below that ligament is the nerve you would have seen the neuroma. Dr. Grimdahl was your expert, right? Yes. Did they testify live or by evidence? Live. So did you consider a request that he offer rebuttal evidence to rebut that causation opinion? I didn't. He was gone. He was from Wisconsin. He drove back. We were done the next day, Judge. We were done. They finished their case Friday morning. I believe this all happened right after Grimdahl left they put on. So I didn't because he's not the right expert. I needed a neurologist at that point. He's an orthopedic surgeon. Is Dr. Kolb a neurologist? No. So did you object to his expressing that opinion based on his lack of qualifications to do so? I didn't. I objected on 213. I didn't object to lack of qualifications because I couldn't I didn't know the expertise until I left that courthouse after a not guilty and went and talked to people and find out that this is a neuromas don't come from degeneration. Did your expert Dr. Grimdahl testify on causation? He did. What he testified that the cause of the neuroma was the scalpel. And what was interesting is Mr. Brandt they had this in their back pocket. I had no idea this was coming. When I look back at the record and I see it crystal clear now Mr. Brandt on cross examination of my expert dabbled in this area of the EMG to see what he could get out on cross. And I realized 213 doesn't apply to cross. But he did it in the hopes of seeing what Dr. Grimdahl would say. If you read that transcript then I have the pages for you at my desk. Dr. Grimdahl was like why are we talking about nerve degeneration in an EMG? He was confused because it was never an issue in the case. And so Mr. Brandt left that issue tried to elicit it on cross left it alone and then hit me with it in their case on chief. So Dr. Grimdahl did not have the opportunity because we didn't know what was happening. It was never an issue. I went to trial relying on the fact that the court had just stricken these new opinions. Why would they file new causation opinions if they felt they had everything they needed in the deposition? They did it 10 weeks before trial and it was stricken. So they knew they had a problem but I went to trial. I would have gotten an expert. I would have dealt with this issue of nerve degeneration and I would have known what these opinions were. But I relied on the court striking those causation opinions. I want to talk briefly about Dr. Fernandez. The Campbell case is on all fours with this very issue. It's not a new issue because it's really based on Boykin. Dr. Fernandez, again, very similar. He gave his discovery deposition. He's a treater. He's a subsequent treater. Very important. Gave his deposition. No opinion on causation. No opinion on standard of care. Gave it in 2012. He said, I haven't read enough records. I don't know. I'm not rendering any opinions. Four years later, four years later, when they disclosed their 213 disclosures, they now added Dr. Fernandez with three pages of additional opinions. Now he's got standard of care and causation opinions. Okay. I came in on a motion. This is a subsequent treater that they're not allowed to speak with under Petrillo. So where did they come up with these new opinions? And I brought the motion. The court struck all these new opinions by Dr. Fernandez because they were not proper. Either they spoke to him, which would have been wrong, or they had, or they were just guessing about what he might say. The court struck them. At the evidence deposition, they launch into all these standard of care and causation opinions. It's an evidence step. I objected. I deal with it before we got to trial. The court let it all in. They let in standard of care. They let in standard of care. The jury was allowed to conclude and speculate and make that causal connection that only can be done by medical testimony. And the Campbell Court reversed it. It was a single issue. It gave the plaintiff a new trial because allowing doctors to testify about possible alternative causes without tying it up, reversible error. And it can't come in the back door of, oh, it's just  his experience. So, it's basically irrelevant testimony. And it's not in case law because this Campbell Court relied on Boykin. And Boykin basically says whoever is going to offer expert testimony, you've got to have causation. It's got to come from a medical doctor. You can't just talk about back in the day it was, well, he hurt his back 10 years ago, he hurt his back in this car accident. We're going to let the jury make that link to say that they're related. You can't do that anymore. And this is really what Boykin said and what Sullivan crystallized. So, that issue alone, allowing the jury to make those conclusions, was highly prejudicial because the jury made that  that, oh, this can happen when the standard of care is compliant. And because he's a treater, you know, it tips the scales. I had an expert, they had an expert. And now they have a treater who has no dog in the fight and I'm stuck with a two-to-one issues on standard of care, two-to-one issue on causation, and I lose. They're hard enough as it is when the fight is even. Mr. Kalish, I'm sorry, you're out of time. All right, thank you. You'll have time in rebuttal. All right, thank you. Thank you. Mr. Brant. May it please the Court, counsel, I want to address one thing that was raised in the briefs and I want to hit it first because I know my time is limited. There were arguments made in the briefs by the plaintiff regarding closing argument and statements that were made in closing arguments and I want to discuss that although it wasn't in the briefs. I get to trial, the first time I had heard about these letters or that they were being relied upon was at trial and so I made a statement about the fact that those two doctors weren't called. The importance of that is this. The inference under the I.P.I. rule 5.01 or the instruction 5.01 is that not calling those witnesses would be adverse, would be evidence that or would be an indication that their testimony would be adverse to the party not calling them. In our case, the damage had long been done. These opinions set forth in these letters were published to the jury, they were put up in front of the jury and those opinions stated in those letters were this. That my client had actually committed malpractice or that he had injured the patient's nerve during the surgery. And so while the plaintiff claims there was some prejudice there, the prejudice had long happened and the prejudice was all coming the way of the defendant. So the jury heard from two individuals through these letters about their opinions, opinions that were from people that didn't treat the patient, that were harmful not to the plaintiff, but clearly harmful to the defense of the case. So while the plaintiff brought that up in the brief, I don't see how they were injured. I don't see how they were prejudiced. I don't see anything because if I'm a juror in this case and I'm listening to me make that argument, I think the only conclusion would be that the defense wouldn't want these individuals to testify because they obviously were not going to be helpful to the defense. So there was an objection nonetheless made and an objection sustained and the jury was admonished. So this case obviously the focus of the case from the plaintiff's perspective is the evidentiary rulings. And so evidentiary rulings were made. This Court knows that the case as well as very strong for the proposition that the trial court has a lot of discretion in making evidentiary rulings. And so since the focus of this case is those particular rulings, I think the Court has to give the trial court latitude. They are there making those determinations in real time. There was a contention that there was a misstatement of the law in the closing argument. I think I made mention of the fact that the letters were hearsay, the letters I mentioned earlier. It is true that experts can rely on hearsay, but that does not make them not hearsay. In other words, it is perfectly appropriate to call out those things as being hearsay because they were. It is contended that the judge did not admonish the jury about the argument. Well, he did. He read IPI 1.01 and the last line of that instruction says, closing arguments are to be disregarded if they aren't supported by the evidence. So the harm that's being claimed with respect to this closing argument, I think, is not borne out by what happened. And obviously the trial judge felt there wasn't anything there that should be done other than to sustain any objections. So that leads us back to the arguments just made. A new trial should only be granted if there is clearly an abuse of discretion. So the trial court, you have to find that the trial court not only just found that there was, that you found that he made mistakes, but there was an absolute abuse of discretion. And this means that no reasonable person in the position of the trial judge would take the view adopted. So this judge had two opportunities to make these rulings. He had an opportunity to trial and there was a post-trial motion where all these things were listed. And so Judge was said in our briefs, I think it's pretty clear that the issues with respect to disclosure, I think we addressed. In fact, our brief's probably too long in that regard and I apologize to the court for that. But I tried very hard to go back and set forth for the court exactly where all the issues were. And so the evidence came in and lastly, there were circumstances where they were complaining about testimony coming in that they brought out on cross examination. And so this brief, this whole contention about disclosure is really rife with the proposition that the statements made in the brief were not borne out by a review of the transcript. And I assume this court takes that pretty seriously. That someone has indicated in a brief that some ruling took place that didn't take place. And so I don't know how this court handles these things, but it seems to me to be a pretty serious thing. When you come to this court and you file an appeal and you make an appeal based upon the proposition that certain rulings were had that don't exist in the record. With respect to the 213 disclosures, I think I've set forth all those things in our brief and the nerve degeneration issue was clearly not  problem for the juvenile couple tunnel syndrome. Now counsel, would you say that in the discovery depositions, the rule 213 disclosures and the evidence depositions that actually Dr. Cole didn't have an evidence file in March on March 4, it says nerve degeneration was caused by carpal tunnel syndrome. It's in there. It's in the disclosure. Those words are in there. Long-term compression will negatively affect the outcome of carpal tunnel syndrome. Those words are in there. Consuelo Ortega's problems today are a result of severe compression of the nerve in the tunnel. Now, you're  the disclosure, the 213 disclosure for Dr. Cole? I am, sir. I am. And this was the one, the initial disclosure that was made. It was made after his discovery deposition. And I think I set forth in the brief, he had not reviewed Dr. Fernandez's records. And so subsequently he was disclosed. So what page of the record is that where in his, in your 213 disclosure you mention nerve degeneration for Dr. Cole? I think if you look at the plaintiff's brief, in the very first part of the brief, they lay out the entire disclosure. So it's all in the brief. I can't, I could find the page for you and I don't think there was a distinction. I don't think that he found that the word compression versus testimony or disclosed opinions that there was a problem related to compression to the nerve was a distinction between whether or not there was degeneration of the nerve. I don't think he found that there was a distinction. And that was the reason for my question earlier to opposing counsel, what's the difference between nerve compression and nerve degeneration? Is there a difference? I don't think so. I think that it was explained by all the testimonies  he gave. The EMG, this study of the nerve, showed nerve degeneration. That's in his cross examination testimony. So it came out through him. Nerve breakdown had already begun in 2007, which is long before the surgery. That's from Dr. Grindel on cross examination. He agreed that the plaintiff had severe carpal tunnel syndrome before the surgery. And he agreed that carpal tunnel syndrome will cause damage to the nerve to the point where it will never recover. So these were opinions that weren't just brought out at the time Dr. Culp took the stand. These were while the plaintiff's own expert was on the stand. At a time period where they had ample opportunities to address it. But he agreed that all those things were there present in the medical record. So I think it belies the record to say that this was somehow first brought to the party's attention when my client took the stand in his own defense. They were clearly brought out. In a quick review of the Walter 213 disclosure for Dr. Culp, I didn't recall seeing it when I read it before and looking at it again now. I don't see it. If you look at page 7 of our brief. I'm on page 11 which says Dr. Culp's Walter 213 disclosures. Yes. If you we had also set forth the opinions and it's on page 7 of our brief and I'm sorry I pointed you in the wrong direction. But the last second paragraph on that page says patients with severe carpal tunnel syndrome like the plaintiff had prior to Dr. Culp's surgery already have severe nerve damage. You're on page 7 of your brief? Yes. It was and he then states before that it was severe on both the right and the left per the EMG studies preoperative. So not nerve degeneration? Well I think that the whole purpose of talking about severe on both the right and left from the EMG studies, the conclusion from the EMG studies was nerve degeneration or nerve injury. So I guess there can be a discussion about whether degeneration means. Well when I asked had it been mentioned in the 213 you said yes. Yes I did. So I followed up and I think the answer is no but I understand your explanation. Yeah and I apologize. I guess I read into that something more than I should have. It says severe nerve damage. Right. What's the difference between that nerve degeneration? I don't think that Judge Lawrence thought there was a distinction. I don't think that the experts made a distinction. More importantly none of the experts took the stand and drew some distinction there. The plaintiff contends that they were somehow ill equipped to present the case. I would say that in one of the arguments made also was that Dr. Lawrence  have an opinion as to causation as to what caused the problem. But we just looked at the disclosure itself. But in the brief of the plaintiff the argument is made that he was never disclosed as having that opinion but at page 25 of their own brief they later then concede well maybe the disclosure does in fact have an opinion as to causation. So kind of beset with a situation where there was a failure to object testimony comes in its opinions were brought out on cross examination not direct examination and there's a failure to get rulings and there's a disclosure in the opinion disclosure. I'm not going to spend much time about Dr. Fernandez. I would just say this to you that Dr. Fernandez discovery deposition was available to the judge the trial judge at the time. He did a cross reference to see if those disclosures were his interpretation of the discovery deposition meets what's in the evidence deposition. You were not in that situation? We were in that situation. We were clearly in a situation where he didn't have to make a decision kind of real time during trial. We're in a situation where we had all the time in the world of pretrial for him to carefully go through and make a determination. He made those determinations. So he had the discovery deposition in front of him? Absolutely. We provide typically and I'm sure he was not in that situation, but he did try to go into an opinion as to what caused it and whether or not your client caused it, but then he was rehabilitated I guess when he was challenged by counsel for the plaintiff and saying hey, you never had an opinion before. Isn't that correct? Didn't you sit for a deposition and testify that you didn't have an opinion? So how does that impact the allegation that he did testify or tried to testify about having an opinion as to the cause but then kind of stepped back when challenged? Well, two things that are important about that. The opinion that they have the most concern about, which was that the neuroma was formed before Dr. Colt's surgery was brought out on cross examination. So that's a problem. I mean, I think you can't come in here and say, gee, that shouldn't have been allowed when it was brought out on cross examination. So that's the argument. Secondly, with respect to Dr. Fernandez's opinions, the contention is they were all general in nature, that they weren't specific to the plaintiff. Well, you kind of can't have it both ways. They weren't specific to Mrs. Ortega, and so that's the contention. But I would say on the key issue that they are complaining about was brought out on cross examination. It was stricken when it was brought out on direct. So I think that's the answer to that. I want to talk about that very briefly. The Campbell case cited by the plaintiffs about general medical questions, we have to think about this for a second because the Campbell case is one where somebody came in and said, well, I think smoking might be related to the back injury. So they're throwing out these opinions that don't really have a basis. What happened here is that the opinions that Dr. Fernandez talked about in his evidence deposition were tied up by Dr. Schiffman, the defense expert, and by Dr. Schiffman who said that the procedure doesn't necessarily bring about a relief. All of those things that were talked about were tied up by Dr. Schiffman. So we have to look at the case from the trial standpoint that the court and the jury hears the testimony about generally what can happen. And it's then the testimony of Dr. Schiffman and Dr. Grindel that in fact what Dr. Fernandez was talking about happened here. So Dr. Schiffman talked about that post-operative pain can be caused and was caused by long-term compression in this case. The exact thing Dr. Fernandez talked about. That adhesions described, so the post-op adhesion, the scar tissue described by Dr. Fernandez was in fact a cause of the problem. This was all evidenced by this nerve study in 2007. That per Dr. Fernandez's note, of course, Dr. Fernandez's note states when he is looking at the nerve, he's the only individual who looks at this nerve after the surgery. He charts. There's no evidence of direct injury to this nerve. This nerve is intact along its course. So all of the things that Dr. Fernandez talked about are clearly tied up with the experts. Plaintiff's expert agreed that, and I went through all those opinions that he agreed to, those were things that Dr. Fernandez had talked about. If the court adopts a rule that says general medical questions are not allowed, then the hypothetical question is gone. There's no hypothetical question that can be used in the courtroom. The hypothetical question is gone if you can't address a witness, a physician who hasn't seen the entirety of the record and say hypothetically, if A, B, and C exist, will D happen? So I don't think that that applies to this case. It does apply to the case where it's pure speculation. And I think that's the Campbell case. Same with the same part of the body rule. The same part of the body rule, which is the Boykin case, you must link up those two things. I would just say that the court has to find there's an abuse of discretion here. The court also has to look at the totality of what transpired at trial. Dr. Fernandez charted in his note long before there was any type of lawsuit or claim that when he looked at the nerve, there was no direct injury to the nerve. There's no evidence of it. And there was no evidence that the nerve was anything other than intact along its course. So this was always going to be an uphill challenge. Thank you. Thank you. Mr. Cantliss, rebuttal argument? I want to start with the 213 issue that this court  Mr. Brandt regarding Dr. Colt. It's easy now because I have the record and I will tell you it's page C 525, not their briefs and what they say in their briefs but the record. So beginning at page C 525 and it goes to page C 528. And that's the 2016 disclosure. The only written opinion disclosure is by Dr. Colt. You can all read it. The word nerve degeneration does not appear. It's not there. And how do we know that? Because 10 weeks before trial they tried to add causation opinions. The court struck it. What about severe nerve damage? How does that differ from the case? Their defense was that compression, long-term compression of that ligament, by the time she came to Dr. Colt, caused nerve damage. There. It caused it there. I had no issue with that. That's the difference. Nerve damage is nerve compression. That was their theory up until I walked into that courtroom. And then it changed. So that's the distinction. Well, the distinction, yes, but what is the distinction between those words, severe nerve damage and nerve degeneration? Do they have different meanings? Yes. Because the meaning is, as it was talked about through discovery, the nerve damage that they were talking about was the difference. We just can't help you. That's the difference. What's nerve degeneration? I don't know. I don't either. Right. We didn't have an expert on that issue. It came out in their case in chief. It was something pulled out of nowhere, which Dr. Colt admitted, I had no choice. When I crossed him, he said, yeah, I guess I just came up with that. I never said that before. So I had no other alternative but to preserve the record for appeal, frankly, and bring that to this court's attention, that not only is it not in his written judgment,  is in his record. And so, once the jury sees that and they see Dr. Colt gesturing saying, this is the most important part of the case, right here, ladies and gentlemen, nerve degeneration, that EMG talks about it being proximal, talks about being in the forearm. I'm done. Because now the jury goes, aha, you wouldn't have been able to see that, Dr. Colt. And so maybe there wasn't a moment there before you ever touched her, and yes, you opened her up and you didn't see it because it was down here. That's the prejudice. That's why I lost this case. Because they moved the location on me. They looked at that EMG and they said, this is the cause of the... Was that the focus of Dr. Colt's closing argument? 100%. They stood up there and it was Dr. Colt himself. He said to the jury, I opened her up, he called it the wrist crease. That's his testimony. That killed me because the jury, and of course, they couldn't explain, that's right, Dr. Fernandez found it right here because our theory is right. I mean, it was here, it wasn't down here. Fernandez found it at the wrist crease, which is where Dr. Colt operated. So that was the problem. But doesn't that help you? No, because the jury, first of all, I mean, they came up with a new opinion that I couldn't deal with. Dr. Fernandez never even talked about that because their expert, Dr. Colt, never even talked about that at trial. But Dr. Schiffman was supporting this new theory that the neuroma was down here and because Dr. Fernandez must have made a bigger incision that he would have then captured that neuroma. So it doesn't help me. Briefly, on the letter, I mean, crash and I said, don't believe it. That's your sake, don't believe it. That's how he used the word, that's how the jury understood it. And to insinuate that I went on the Internet like anybody can go on the Internet and create a document was devastating. I mean, credibility is everything in these trials. And so, the jury now thinks that I fabricated evidence when we had a sidebar before I published that letter. That letter was part of the worker's comp file. That is, as this court knows, it's an IME done because they didn't understand why this lady needed a second surgery, the worker's comp. So they call up Dr. Fernandez  Dr. Fernandez says, because the nerve was lacerated. That's what's in the letter. That's what's in the letter. It was a basis for Dr. Grindel, my expert's opinion. It's pretty important. It's a medical record signed by a doctor. And the 501 comment, the comment, I did a motion to leave the site additional authority  a plaintiff. The motion is allowed. Appellees are given leave to file a response if they wish to do so within the next seven days. The court will take the case under advisement with a written decision.  you.